UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA MARTIN a/k/a LYNDA MARTIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SS COLUMBA-BRIGID CATHOLIC )<br>CHURCH, WILLIAM J. JUD WEIKSNAR, )<br>and DOES 1–100, )<br>)<br>Defendants. ) | Case No. 1:21-cv-491 |

**ORDER ON MOTIONS TO DISMISS**
**(Docs. 7, 16)**

Plaintiff Linda Martin sues her former employer SS Columba-Brigid Catholic Church[1] ("SSCB"), SSCB's pastor William J. Jud Weiksnar ("Father Jud"),[2] and 100 unnamed "Doe" defendants alleging that she was wrongfully terminated from her position as Choir Director on the basis of her race. (*See* Doc. 15.) The First Amended Complaint asserts six counts: (1) race discrimination in violation of 42 U.S.C. § 1981 against SSCB; (2) race discrimination in violation of Title VII of the Civil Rights Act of 1964 against SSCB; (3) race discrimination in violation of New York State Human Rights Law ("NYSHRL") Executive Law § 290 against SSCB; (4) race discrimination in violation of NYSHRL against Father Jud; (5) negligent infliction of emotional distress ("NIED") against all defendants; and (6) intentional infliction of emotional distress ("IIED") against all defendants. Currently pending are SSCB and

---

[1] The court understands that the official name of the employer is "Sts. Columba-Brigid Roman Catholic Church of Buffalo, N.Y.," a non-profit corporation. (*See* Doc. 17 at 5 n.2.)

[2] The court refers to Defendant Weiksnar as "Father Jud," adopting that nickname as used in the defense filings.

Father Jud's motions to dismiss the original and Amended Complaints under Fed. R. Civ. P. 12(b)(6). (Docs. 7, 16.)

**Procedural History**

Ms. Martin filed her original Complaint on April 13, 2021. (Doc. 1.) She re-filed that pleading to correct the caption on April 14, 2021. (Doc. 5.) On October 8, 2021, SSCB and Father Jud filed a motion to dismiss all claims on the basis of the "ministerial exception" and to dismiss the NYSHRL claim against Father Jud. (Doc. 7.) In a series of stipulations filed in October and November 2021, the parties agreed to extend the deadline for Ms. Martin to respond to the motion, the most recent of which extended the deadline to November 18, 2021. (*See* Docs. 12, 13, 14.)

Ms. Martin filed a "First Amended Complaint" ("FAC") on November 18, 2021. (Doc. 15.) She included a cover letter explaining that the FAC "strives to address and resolve the points raised in Defendants' motion to dismiss." (Doc. 15-1.) The FAC was not accompanied by a motion to amend under Fed. R. Civ. P. 15(a)(2). It also did not include a "redlined" copy showing the changes from the original as Local Rule 15(b) requires for motions to amend. The FAC removed the Diocese of Buffalo as a defendant and added the NIED and IIED claims. It also added a number of new allegations, including assertions that Ms. Martin was "not a 'minister' in any sense" (Doc. 15 at 3, ¶ 7) and that her duties included leading secular youth choirs (*id.* ¶¶ 10–11, 24).[3]

SSCB and Father Jud filed a motion to dismiss the FAC on December 9, 2021. (Doc. 16.) They assert that the FAC is procedurally improper (Doc. 17 at 6 n.3) but have not

---

[3] The numbered paragraphs in the FAC restart at "1" after the sixth paragraph. (*See* Doc. 15 at 2.) The court cites to page numbers as necessary to avoid ambiguity.

2

moved to strike it.[4] Instead, they have withdrawn their earlier motion to dismiss (*see* Doc. 18 ¶ 2) and now seek dismissal of the FAC "in an effort to bring this case to resolution without incurring additional delays and unnecessary litigation." (Doc. 17 at 6 n.3.) The court will accordingly mark the October 2021 motion to dismiss as WITHDRAWN and considers the December 2021 motion below.

Ms. Martin did not file an opposition to the December 9, 2021 motion within the 14 days specified by Local Rule 7(b)(2)(B). But on December 27, 2021, she filed a motion seeking an extension of time to file her response. (Doc. 20.) The court granted that motion and granted further extensions of time to file the response, the most recent of which extended the deadline to February 18, 2022. (Docs. 21, 22, 24, 25.) Ms. Martin has still not filed any opposition to the December 2021 motion. SSCB and Father Jud filed a letter on March 15, 2022 requesting that the court treat the December 2021 motion as unopposed. (Doc. 26.)

## Background

The FAC includes the following allegations. Ms. Martin is a Black woman. (Doc. 15 at 2, ¶ 5.) The Diocese of Buffalo and/or SSCB employed her as a Choir Director from 1990 until July 21, 2020. (*Id.* ¶ 6.) The Roman Catholic Diocese of Buffalo serves eight counties in western New York State with a Catholic population of nearly 700,000. (*Id.* ¶ 1.) It is divided into more than 150 parishes, which support churches, schools, convents, seminaries, hospitals, and colleges. (*Id.*) SSCB is one of the churches in the Catholic Diocese of Buffalo and is located at 75 Hickory Street, Buffalo, New York. (*Id.* ¶ 2.) It is one of the few with a

---

[4] Although it is unnecessary to rule as to whether the FAC is procedurally improper, the court notes that the deadlines for amendment as a matter of course under Fed. R. Civ. P. 15(a)(1)(B) can be extended by stipulation. *See* 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1480 (3d ed.) ("[I]f the time for serving the responsive pleading is extended . . . by stipulation, the period for amending as of right also may be enlarged.").

"predominantly large Black congregation." (*Id.*) SSCB holds itself out as "a welcoming, inclusive, multicultural Catholic community inspired by the Holy Spirit to celebrate the risen Christ in how we worship, love our neighbors, and work for justice in our daily lives." (Doc. 15 ¶ 8.)

SSCB hired Ms. Martin "in approximately 1990 to perform as Choir Director, tasked with arranging music with the choir for various non-ministerial events and for mass." (*Id.* ¶ 7.) Ms. Martin asserts that she was not a "minister" in any sense. (*Id.*) At all relevant times, SSCB had a Minister of Music who was responsible for "the religious aspect of music for mass." (*Id.*) Brian Simmons was the Minister of Music for the nine years preceding Ms. Martin's termination. (*Id.*)

In her 36 years of service at SSCB, Ms. Martin created music and worked exclusively with children and young adults. (*Id.* ¶ 9.) She established the "Just N Time Dance" group. (*Id.*) She traveled throughout western New York with young people aged 12–17 to perform at different venues. These included weddings, competitions, and cultural events—all "nonecclesiastical in nature." (*Id.*) She formed a choir for children aged 6–11 who sang secular songs at nonreligious socials, recitals, skilled nursing facilities, and special events. (*Id.* ¶ 10.) She also formed a separate youth choir for kids ages 13–18 who sang secular songs at weddings, funerals, skilled nursing facilities, and special events. (*Id.* ¶ 11.) She formed a non-denominational group for children aged 3–6 to teach oratorical speaking and presentation and reciting poetry. (*Id.* ¶ 12.) And for the past 29 years, she co-hosted a traveling Harvest Fest Annual Concert. (*Id.* ¶ 13.)

During her employment, Ms. Martin performed "impeccably" in her position, was comfortable in her work environment and job duties, advocated inclusivity for all members of

4

the church community, and was a beloved Choir Director. (*Id.* ¶ 14.) She never had any performance issues or criticism about her music choices as Choir Director. (*Id.* ¶ 16.) She was never given any unfavorable performance reviews and never had any irreconcilable disagreements with any priest or choir member. (*Id.* ¶ 17.) She continued to provide her "music ministry duties" during the COVID-19 pandemic with recorded services. (*Id.* ¶ 22.)

Father Jud joined SSCB in 2018. (*Id.* ¶ 18.) He became Ms. Martin's supervisor and "immediately targeted her unfavorably as a black woman." (*Id.* ¶ 15.) According to the FAC, it was evident to Ms. Martin within a short period of time that "he was not invested in the black community or her as a black Choir Director." (*Id.* ¶ 18.) She alleges that Father Jud "had an agenda to replace the black members with a white congregation" and that he was "insensitive, overbearing, manipulative and condescending towards black members and Ms. Martin." (*Id.*) Ms. Martin further alleges that Father Jud "pitted black parishioners against each other, causing dissension and confusion among members" and that "[h]is condescending attitude created conflict and unrest." (*Id.* ¶ 19.) He often stated that he "went to law school and knew how to turn a situation for his favor." (*Id.*)

According to the FAC, Father Jud "refused resources to Ms. Martin to assist in youth programs that he required her to start and gave those resources to a white colleague to ensure her success and Ms. Martin's failure." (*Id.* ¶ 20.) He did praise Ms. Martin's musical selection in emails, deferred to her musical judgment, remarked on how good the music was, and complimented the choir's singing. (*Id.* ¶¶ 21–22.) But he abruptly terminated her employment in a phone call on July 21, 2020, claiming that "the music at the Mass was not up to the standard required for the liturgy." (*Id.* ¶ 23.)

5

Linda Appleby, a white female, replaced Ms. Martin as Choir Director. (*Id.* ¶ 25.) The FAC asserts that when Father Jud introduced Ms. Appleby to the congregation, he falsely insinuated that Ms. Martin had quit her position and decided never to come back. (*Id.* ¶ 26.) Ms. Martin asserts that Ms. Appleby's musical direction "lacks the proper qualification and reception for the congregation." (*Id.* ¶ 25.) According to Ms. Martin, Ms. Appleby "sticks to [the] more subdued music style of traditional Catholic churches attended by mostly white people." (*Id.*) Ms. Martin further asserts that Ms. Appleby "was unable to lead the secular youth groups." (*Id.*)

After Ms. Martin's termination, church members protested her ouster but Defendants "ignored" their concerns. (*Id.* ¶ 27.) All but two members of SSCB's Gospel Choir stepped down. (*Id.* ¶ 28.) On July 8, 2020, the Choir sent a letter to Defendants' Apostolic Administrator, Bishop Edward Scharfenberger, requesting an investigation into Father Jud and Ms. Martin's termination. (*Id.*)[5] They received no response from Defendants. (*Id.*)

In written correspondence to Defendants, some SSCB parishioners asserted that "[t]he demons of racism, bigotry, egomania[] and prejudice are not supposed to be found in our church and [definitely] not in our leadership." (*Id.* ¶ 29.) On September 29, 2020, Ms. Martin attempted to set up a meeting with SSCB to discuss her termination and request reinstatement. (*Id.* ¶ 30.) Although Ms. Martin had been informed that SSCB wanted to "have that discussion," Father Jud "refused to participate or allow the meeting to go forward." (*Id.*) Ms. Martin asserts on information and belief that Father Jud "admitted that he met with and was carrying forward the [agenda] of four (4) other leaders of Defendant SSCB who finally saw their opportunity to increase Caucasian membership by firing Ms. Martin." (*Id.* ¶ 31.)

---

[5] July 8, 2020 was before Ms. Martin's July 21, 2020 termination. One of the two July 2020 dates appears to be a typo but the precise dates are not relevant to any issue currently before the court.

6

## Analysis

### I.  Rule 12(b)(6) Standard

On a Rule 12(b)(6) motion, the court's task is to determine whether, accepting as true the complaint's non-conclusory allegations, "and drawing all reasonable inferences in favor of the non-movant, plaintiffs have stated a facially valid claim." *Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 319 (W.D.N.Y. 2021) (cleaned up). "In order to be found sufficient, a pleading must set forth sufficient facts to suggest that a cause of action is legally plausible." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Ultimately, where a plaintiff has not nudged their claim across the line from conceivable to plausible, their complaint must be dismissed." *Id.* (cleaned up).

A plaintiff's failure to file an opposition to a Rule 12(b)(6) motion does not, on its own, justify dismissal. *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal."). Still, the court can grant dismissal under Rule 12(b)(6) on the basis of an affirmative defense if that defense appears "on the face of the complaint." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

### II.  Motion to Dismiss First Amended Complaint (Doc. 16)

SSCB and Father Jud argue that the "ministerial exception" bars all of Ms. Martin's employment discrimination claims—i.e., Counts 1–4. (*See* Doc. 17 at 10.) The court begins with that issue.

A.  **Employment-Discrimination Claims; Ministerial Exception**

"The ministerial exception bars employment-discrimination claims brought by ministers against the religious groups that employ or formerly employed them." *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 198 (2d Cir. 2017) (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 196 (2012)).[6] "This doctrine addresses a tension between two core values underlying much of our constitutional doctrine and federal law: equal protection and religious liberty." *Fratello*, 863 F.3d at 198. "In the context of employment disputes, these two core values sometimes conflict, and a balance must be struck." *Id.* at 199. "*Hosanna-Tabor* instructs that where a defendant is able to establish that the ministerial exception applies . . ., the 'First Amendment has struck the balance for us' in favor of religious liberty . . . ." *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 196).

"The purpose of the ministerial exception is to ensure that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 423 (2d Cir. 2018) (cleaned up). "The ministerial exception 'operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 195 n.4). The exception "is not limited to the head of a religious congregation" and there is no "rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor*, 565 U.S. at 190. But courts can consider: "[1] the formal title given [to the plaintiff] by the Church, [2] the substance reflected in that title,

---

[6] The Supreme Court's unanimous decision in *Hosanna-Tabor* met with "swift and varied" criticism. John Robinson, Note, *Neither "Ministerial" Nor an "Exception": The Ministerial Exception in Light of Hosana-Tabor*, 37 Harv. J. L. & Pub. Pol'y 1151, 1151 & nn.3–5 (2014). Other commentators support the doctrine articulated in *Hosanna-Tabor*. *See id.* at 1152 (asserting that *Hosanna-Tabor* fully complies with prior law and doctrine and is best conceptualized as neither "ministerial" nor an "exception"). The district court's role in this case is limited to applying the law is it now stands.

[3] her own use of that title, and [4] the important religious functions she performed for the Church." *Id.* at 192.

Courts are not limited to those considerations and are not required to apply them in every case. *Fratello*, 863 F.3d at 204–05. But where the four considerations are relevant, "courts should focus primarily on the functions performed by persons who work for religious bodies." *Id.* at 205 (cleaned up) (quoting *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring)); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020) ("What matters, at bottom, is what an employee does."). Here, as in *Fratello*, the court concludes that the four *Hosanna-Tabor* considerations—plus an examination of the nature of the dispute—are "adequate to resolve the particular circumstances of this case." *Fratello*, 863 F.3d at 206.

### 1.   Formal Title

The FAC states that Ms. Martin's title was "Choir Director." (Doc. 15 at 2, ¶ 6.) Ms. Martin contrasts her title with that of "Minister of Music," the title that Brian Simmons held for the nine years preceding Ms. Martin's termination. As the title suggests, "Minister of Music" is a ministerial title. The title of "Choir Director" is not so obviously ministerial. But since Ms. Martin's position as Choir Director included arranging choir music for mass (Doc. 15 at 3, ¶ 7), it is not so obviously non-ministerial as, for example, the roles of bookkeeper or janitor. *See Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (member of a religious institution's janitorial staff was not a "minister"). Ms. Martin's title as Choir Director is not dispositive in this case. *See Fratello*, 863 F.3d at 205 ("[A] formal title indicating that the plaintiff is playing a religious role, though often relevant, 'is neither necessary nor sufficient . . . .'" (quoting *Hosanna-Tabor*, 565 U.S. at 202 (Alito, J., concurring)).

9

### 2. Substance Reflected in the Title

This consideration evaluates the extent to which the formal title reflects the substance of an employee's duties, such as religious education, training, proficiency, or authority. *See Hosanna-Tabor*, 565 U.S. at 191 (plaintiff's title as minister "reflected a significant degree of religious training followed by a formal process of commissioning"); *Fratello*, 863 F.3d at 208 (plaintiff's title as "lay principal" of a Roman Catholic school entailed "proficiency in religious leadership"). Here, the FAC contains no allegations regarding the qualifications for the Choir Director position. There are no allegations that Ms. Martin completed any religious education or training or that her position as Choir Director required such a background. To the extent the Choir Director title reflects religious substance, the court addresses that issue in the fourth consideration that focuses on the functions performed.

### 3. Ms. Martin's Use of the Title

As in the case of the school principal in *Fratello*, the FAC does not allege that Ms. "accept[ed] a formal call to religious service." *Fratello*, 863 F.3d at 208; *cf. Hosanna-Tabor*, 565 U.S. at 191–92 (plaintiff "held herself out as a minister of the Church by accepting the formal call to religious service"). Nor is there an allegation that Ms. Martin claimed any particular benefits on the basis of being in a ministry. *Cf. Hosanna-Tabor*, 565 U.S. at 192 (plaintiff claimed special housing allowance on her taxes that was available only to employees earning their compensation "in the exercise of the ministry"). Notably, Ms. Martin's own filings in this case state that she performed "music ministry duties." (Doc. 15 at 6, ¶ 22.) These filings indicate that Ms. Martin herself "understood that she would be perceived as a religious leader." *Fratello*, 863 F.3d at 208.

### 4. Functions Performed

As the Second Circuit concluded in *Fratello*, the court in this case finds that the most important consideration is "whether, and to what extent, the plaintiff performed important religious functions for her religious organization." *Fratello*, 863 F.3d at 208–09 (cleaned up). In her original Complaint, Ms. Martin stated that in her position as Choir Director she was "tasked with arranging the musical playing of Gospel-style music that is often featured in Black Christian congregations." (Doc. 5 ¶ 7.) She also described the choir she led as a "Gospel Choir." (*Id.* ¶ 12.)

SSCB and Father Jud assert that Ms. Martin's prior allegations to that effect are judicial admissions. (*See* Doc. 17 at 7.) The court disagrees because, by challenging the FAC, the Motion to Dismiss effectively treats the FAC as the operative pleading. As such, the FAC supersedes the original Complaint, the superseded portions of which ceased to be conclusive judicial admissions. *See Jean-Louis v. Carrington Mortg. Servs., LLC*, 849 F. App'x 296, 299 n.15 (2d Cir. 2021) (summary order) ("When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission . . . ." (quoting *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929))).

Even if not conclusive judicial admissions, the statements in the original Complaint about Ms. Martin's direction of a Gospel choir are "seriously made" statements. *Id.* (quoting *Kunglig*, 32 F.2d at 198). Since the statements are not conclusive judicial admissions, they are "controvertible." *Id.* (quoting *Kunglig*, 32 F.2d at 198). But Ms. Martin has offered no basis to controvert them. Perhaps more importantly, the FAC continues to refer to the choir that Ms. Martin directed as a "Gospel Choir." (Doc. 15 ¶ 28.)

11

The court recognizes that Gospel music is intimately connected to the Christian religion. Indeed:

> Gospel music, as the term is understood in the performance trade, is popular music with lyrics based on the four Gospels of the New Testament . . . . [I]t is a hymn addressed to the Deity. It is praise or prayer. The word gospel means good news and the gospel song is addressed to men.

*Affiliated Music Enters. Inc. v. Sesac, Inc.*, 160 F. Supp. 865, 867 (S.D.N.Y. 1958) (internal quotation marks omitted). But presumably it is possible to perform Gospel music, or even lead a Gospel ensemble, without believing in a deity or intending to offer praise or prayer. The court therefore considers the context in which Ms. Martin performed her work as Choir Director.

The FAC includes allegations that Ms. Martin directed SSCB's choir (Doc. 15 at 6, ¶ 22), made music choices for the choir (*id.* ¶¶ 16, 21), and exercised "musical judgment" (*id.* ¶ 21). The FAC indicates that Father Jud was Ms. Martin's supervisor and that Ms. Martin arranged music for mass at SSCB. (*See id.* ¶¶ 7, 15, 23.) Father Jud is a priest and mass is a religious ceremony in the Catholic faith.

On the basis of these facts as alleged in the FAC, the court concludes that Ms. Martin performed duties with a "significant religious dimension." *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1041 (7th Cir.) (Posner, J.), *cert. denied*, 549 U.S. 881 (2006), *abrogated on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4.[7] In *Tomic*, the former music director and organist of a Catholic church and its diocese sued for age discrimination. His job description for the diocesan position required him "to assist the Office of Divine Worship in preparing and celebrating various diocesan liturgies" and "in planning and celebrating liturgical events as

---

[7] The *Hosanna-Tabor* Court abrogated *Tomic* insofar as *Tomic* held that the ministerial exception is a jurisdictional bar instead of an affirmative defense. The *Hosanna-Tabor* decision did not upset *Tomic* in any other respect.

12

requested." *Id.* at 1037. His job description for the church job required him to play organ for masses and other events such as weddings and funerals, and—in his capacity as music director—to "prepare music for all Parish masses and liturgies . . . in consultation with the Rector/Pastor where necessary" and to "recruit, train, direct, and rehearse the members of the chorus." *Id.*

"A dispute with the bishop's assistant concerning the scheduling of Easter music culminated in Tomic's dismissal from both positions; he was 50 years old and was replaced by a much younger person." *Id.* The district court dismissed the suit and the Seventh Circuit affirmed. Writing for the court, Judge Posner rejected Tomic's assertions that "all [he] did was play music" and that "music has in itself no religious significance." *Id.* at 1040. The court reasoned that selecting music to be played at mass required "discretionary religious judgment" and that "'[m]usic is an integral part of many different religious traditions,' including the Catholic tradition." *Id.* at 1040–41 (quoting *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000)).

The court concluded that Tomic "performed tasks that were 'traditionally ecclesiastical or religious'" and that his duties "had a significant religious dimension" such that he forfeited his rights under the Age Discrimination in Employment Act. *Id.* at 1041 (quoting *Starkman v. Evans*, 198 F.3d 173, 177 (5th Cir. 1999)). Other courts have reached similar conclusions. *See Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 978 (7th Cir. 2021) (church's music director, choir director, and organist was a "minister"; he assisted in the celebration of mass and "[h]is participation in the liturgy was the reason for his work"); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 178 (5th Cir. 2012) (music director who played the piano at mass and made "unilateral, important decisions regarding the musical direction at mass" was a "minister"); *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 572 (7th Cir. 2019)

13

(ministerial exception applied to church organist where organ playing served a religious function in the parish).

Although *Tomic* is not controlling authority within the Second Circuit, the court finds it persuasive. The Second Circuit and this court have both cited *Tomic* favorably in discussing the ministerial exception. *Rweyemamu v. Cote*, 520 F.3d 198, 205 (2d Cir. 2008); *Rojas v. Roman Catholic Diocese of Rochester*, 557 F. Supp. 2d 387, 396 (W.D.N.Y. 2008). Ms. Martin has articulated no basis on which to distinguish *Tomic*. And the court has found no cases departing from what appears to be a consensus that "music teachers and directors can be deemed ministers subject to the ministerial exception." *Curl v. Beltsville Adventist Sch.*, No. GJH-15-3133, 2016 WL 4382686, at *9 (D. Md. Aug. 15, 2016).

This case differs from *Tomic* in some respects. Ms. Martin claims race discrimination, not age discrimination. But the ministerial exception applies to all employment discrimination claims. *See, e.g., Miller v. Bay View United Methodist Church, Inc.*, 141 F. Supp. 2d 1174, 1183 (E.D. Wis. 2001) (ministerial exception barred African-American choir director's race-discrimination claim because "the plaintiff engaged in traditionally ecclesiastical or religious activities").

And unlike the music director in *Tomic*, Ms. Martin did not direct all music at SSCB. She directed only the choir while, according to the FAC, another employee—the Minister of Music—was "in charge of religious music for mass." (Doc. 15 at 3, ¶ 7.) But even if the Minister of Music had some supervisory role over the Choir Director or a broader scope of responsibility, the Choir Director's leadership of her ensemble is leadership of a musical art that forms an "integral part" of the Catholic tradition. *Tomic*, 442 F.3d at 1041; *see also Starkman*,

14

198 F.3d at 177 (church's choirmaster and director of music conceded that "music constitutes a form of prayer that is an integral part of worship services and Scripture readings").

The FAC identifies a number of secular duties that Ms. Martin performed while serving as SSCB's Choir Director. She established a dance group, performed at civic events, formed two youth choirs, formed a youth oratorical and poetry group, and co-hosted a traveling Harvest Fest Annual Concert. But the choirmaster in *Starkman* also performed certain secular duties. *Starkman*, 198 F.3d at 176. So did the music director in *Cannata*. 700 F.3d at 171 (oversaw budget and expenditures and maintained sound equipment and music room). Even when drawing all reasonable inferences in Ms. Martin's favor, the court concludes that the FAC indicates that Ms. Martin's "primary functions" at SSCB were to "serve its spiritual and pastoral mission." *Starkman*, 198 F.3d at 176 (quoting *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996)).

### 5. Nature of the Dispute

In addition to the considerations above, the court must evaluate "the nature of the dispute." *Rojas*, 557 F. Supp. 2d at 398 (quoting *Rweyemamu*, 520 F.3d at 208). According to the FAC, Father Jud told Ms. Martin that he terminated her "because the Music at the Mass was not up to the standard required for the liturgy." (Doc. 15 ¶ 23.) Ms. Martin contends that the reason Father Jud gave for the termination was a pretext for race discrimination. (*See id.*) Here, as in *Rweyemamu*, a court attempting to resolve that dispute would "impermissibl[y] entangle[]" itself with religious doctrine. 520 F.3d at 209.

For the reasons discussed above, the court concludes that the ministerial exception bars all of Ms. Martin's federal employment discrimination claims against SSCB and Father Jud. Although the court has discretion to decline to exercise supplemental jurisdiction over the

15

remaining state-law claims, 28 U.S.C. § 1367(c)(3), the court elects to retain jurisdiction over those claims in the interests of judicial economy, convenience, and fairness. *See Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998) (where the district court has dismissed all claims over which it has original jurisdiction, it has discretion to determine whether to exercise supplemental jurisdiction).

The court concludes that the ministerial exception also bars Ms. Martin's NYSHRL race discrimination claims. *See Shukla v. Sharma*, No. 07 CV 2972 (CBA), 2009 WL 10690810, at *3 (E.D.N.Y. Aug. 21, 2009) ("Given that the ministerial exception is grounded in the First Amendment, it may be applied 'to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers.'" (quoting *Werft v. Desert SW Annual Conf. of United Methodist Church*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004))), *report and recommendation adopted*, 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009). It remains to consider Ms. Martin's NIED and IIED claims.

### B. NIED and IIED Claims

SSCB and Father Jud seek dismissal of the NIED and IIED claims in two different ways. First, they argue that the NIED and IIED claims "amount to an improper attempt to circumvent employment discrimination laws, which provide [Ms. Martin] no remedy due to the application of the ministerial exception." (Doc. 17 at 19.) Second, they contend that the NIED and IIED claims suffer from "separate legal deficiencies specific to each of those causes of action[]." (*Id.*) The court begins with the latter argument and examines the plausibility of the NIED and IIED claims in turn under New York substantive law. *See* 28 U.S.C. § 1367(a); *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir. 1991) ("In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim.").

16

### 1. NIED Claim

SSCB and Father Jud contend that Ms. Martin's NIED claim is barred by the exclusivity provision of the New York Workers' Compensation Law. (Doc. 17 at 20.) The court agrees. In New York, "[t]he right to compensation under this chapter [N.Y. Workers' Comp. Law], shall be the exclusive remedy to an employee . . . when such employee is injured . . . by the negligence or wrong of another in the same employ." N.Y. Workers' Comp. Law § 29(6). This provision bars NIED claims brought in connection with alleged violations of employment law. *See Jarzembek v. Cnty. of Erie*, No. 1:20-cv-1796, 2021 WL 4711485, at *2 (W.D.N.Y. Oct. 8, 2021) (section 29(6) barred NIED claim arising out of alleged constructive termination of employment).

### 2. IIED Claim

SSCB and Father Jud assert that Ms. Martin's IIED claim should be dismissed as untimely, insufficiently pled, or duplicative of her employment-discrimination claims. (Doc. 17 at 20–21).[8] The court will dismiss the IIED claim as insufficiently pled.[9]

---

[8] SSCB and Father Jud do not seek dismissal of the IIED claim on the basis of the exclusivity provision of the New York Workers' Compensation Law. That might be an independent ground upon which to dismiss the IIED claim. *See Kujawski v. Liberty Mut. Ins. Co.*, No. 19-CV-603S, 2021 WL 2649576, at *6 (W.D.N.Y. June 28, 2021) (exclusivity provision barred both NIED and IIED claims). But since SSCB and Father Jud do not make this argument, the court does not address it.

[9] The court declines to address SSCB and Father Jud's statute-of-limitations argument. It is true that "[t]he statute of limitations for IIED claims is one year under New York law." *Watkins v. Town of Webster*, No. 6:21-CV-06233 EAW, 2022 WL 827824, at *20 (W.D.N.Y. Mar. 17, 2022) (citing C.P.L.R. § 215). And it is also true that Ms. Martin did not raise her IIED claim until she filed the FAC on November 18, 2021. But the court is not so confident that all conduct before November 18, 2020 is time-barred. SSCB and Father Jud do not address the potential impact of the relation-back doctrine and C.P.L.R. § 203(f) ("A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions,

17

To establish an IIED claim under New York law, a plaintiff must prove four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 98 (W.D.N.Y. 2018) (quoting *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013)). The first element requires conduct so "extreme and outrageous . . . to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Jarzembek v. Cnty. of Erie*, No. 1:20-cv-1796, 2021 WL 2155442, at *6 (W.D.N.Y. May 27, 2021) (alteration in original) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983)). This is an "exceedingly high legal standard." *Id.* (quoting *Chanko v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016)).

Ms. Martin's allegations of discriminatory termination alone are insufficient to support this element of an IIED claim. *See Paulson v. Tidal*, No. 16-CV-09049-LTS-OTW, 2018 WL 3432166, at *4 (S.D.N.Y. July 16, 2018) ("Allegations of wrongful termination alone, without more, do not 'rise to the level of outrageousness New York law demands for a viable IIED claim.'" (quoting *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393, 402 (S.D.N.Y. 2008))). A discriminatory termination could arguably support an IIED claim where it is accompanied by other "hallmarks" of an IIED claim. *See id.* (hallmarks of successful IIED claims include: (i) public humiliation; (ii) false accusations of criminal or heinous conduct; (iii) verbal abuse or harassment; and (iv) physical assault or battery).

---

occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.").

The FAC lacks such allegations. Ms. Martin alleges that Father Jud "targeted," "harassed," and "undermined" her. (Doc. 15 ¶ 15.) She also alleges that he was "insensitive, overbearing, manipulative and condescending towards black members and Ms. Martin." (*Id.* ¶ 18.) But the FAC lacks any allegations regarding particular words, conduct, or examples. This is insufficient to plausibly support the first IIED element. *See Jarzembek*, 2021 WL 2155442, at *6 (plaintiff's mere allegations that defendants "harassed" and "defamed" him insufficient to plausibly support the "extreme and outrageous" element of an IIED claim).

Because Ms. Martin has failed to state plausible NIED or IIED claims, it is unnecessary for the court to determine whether the ministerial exception might bar those claims or whether those claims could be dismissed as an "improper attempt" to circumvent the exception. That question need not be answered in this case. *See Hosanna-Tabor*, 565 U.S. at 196 (expressing "no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers").

C. **Leave to Amend**

Because the court has authority to grant leave to amend *sua sponte*—*see Sit N' Stay Pet Servs., Inc. v. Hoffman*, No. 17-CV-00116-LJV-JJM, 2017 WL 3845595, at *2 (W.D.N.Y. Apr. 17, 2017), *report and recommendation adopted* 2017 WL 3866026 (W.D.N.Y. Sept. 5, 2017)—the court has considered whether to do so here. In cases where the plaintiff is counseled and has already amended the complaint, this court has declined to *sua sponte* grant leave to amend. *Terranova v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 268 F. Supp. 3d 453, 456 n.3 (W.D.N.Y. 2017). Those circumstances are present in this case. In addition, better pleading would not defeat the ministerial exception defense. *See Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-CV-3809 (JMF), 2021 WL 2206486, at *11 (S.D.N.Y. June 1,

19

2021) (dismissing discrimination claims with prejudice as barred by the ministerial exception because "the problems with the claims are substantive and amendment would therefore be futile").

**III.   Does 1–100**

The FAC names "Does 1–100" as defendants. (Doc. 15 at 1.) But the docket reflects that none of these defendants have been served. Since the 90-day time limit for service specified in Fed. R. Civ. P. 4(m) has long passed, the court advises Ms. Martin that it intends to dismiss the action without prejudice against those defendants. The court grants Ms. Martin 14 days to file any opposition to dismissal of the "Doe" defendants under Rule 4(m).

### Conclusion

The Motion to Dismiss filed on October 8, 2021 (Doc. 7) has been WITHDRAWN.

The Motion to Dismiss filed on December 9, 2021 (Doc. 16) is GRANTED. All of Ms. Martin's claims against SS Columba-Brigid Catholic Church and William J. Jud Weiksnar are DISMISSED with prejudice.

The court grants Ms. Martin 14 days to file any opposition to dismissal of the "Doe" defendants on the court's own motion under Rule 4(m).

Dated this _11_ day of August, 2022.

Geoffrey W. Crawford, Judge
United States District Court